| | | |
|---|---|---|
| **OnSomble, Inc.,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:16-cv-493 |
| | ) | |
| **Maria O'Rourke,** | ) | Judge Crenshaw |
| | ) | Magistrate-Judge Newbern |
| Defendant. | ) | |
| | ) | |

**Reply in Support of Defendant's Motion for Determination of Privilege**

The Defendant, Maria O'Rourke, makes the following arguments in further support of her Motion for Determination of Privilege (Doc. 77), to correct and respond to the arguments made by the Plaintiff, OnSomble, Inc. ("OnSomble") in its opposition to the Motion for Determination of Privilege (Doc. 85) (the "Opposition" or "Opp.").

**I.  OnSomble's efforts to avoid disclosure of the documents at issue were unreasonably sloppy. Among other things, OnSomble spent less than three seconds per page in pre-production review, and was not looking for privileged documents during that review.**

To determine whether Plaintiff's efforts to prevent disclosure of the documents at issue were reasonable, the Court must be told, at a minimum, what Plaintiff's counsel did to prevent the disclosure. *See First Tech. Capital, Inc. v. JP Morgan Chase Bank, N.A.*, 2013 U.S. Dist. LEXIS 185763, at *9-10 (E.D. Ky. Dec. 10, 2013) ("The reasonableness of preventive steps surely includes both a design and an implementation component."). Yet, Plaintiff's counsel solely responsible for the review and production of Plaintiff's documents, James Wiggington, discloses next to nothing about what he did to prevent inadvertent production of privileged documents. All he tells the Court is that (1)

1

he spent 36.6 hours "compiling, reviewing, printing, and scanning the document production"; and (2) that his document review consisted of "reading each document, determining relevance, and removing items which were not relevant." Declaration of James Wiggington ("Wiggington Decl.") (Doc. 85-2) ¶ 4. He says nothing more about his pre-production review.

Astoundingly, *Mr. Wiggington does not say he was looking for privileged documents, only relevant ones*.[1] For that reason alone, Mr. Wiggington's plan for identifying and removing privileged documents was unreasonable, and Defendant's Motion should be granted. He was never looking for potentially privileged documents.

Further, 36.6 hours was far too little time to spend reviewing Plaintiff's documents. Mr. Wiggington does not say how many documents he reviewed in those 36.6 hours. He also does not say how much of those 36.6 hours he spent actually reviewing the documents, as opposed to "compiling, ... printing [and] scanning the document production." (In this context, "scanning" surely means turning a paper document into a computer file using a scanning machine.) Plaintiff has produced 51,732 pages of documents so far. *See* July 19, 2017 Declaration of Richard G. Sanders ("Sanders Reply Decl."), ¶ 2. If Mr. Wiggington reviewed only the documents he produced and spent all of his time reviewing documents, this would amount to 1413 pages per hour, or 23.5 pages per minute, or one page every two and a half seconds. This would be already unreasonable. *See First Tech.*, 2013 U.S. Dist. LEXIS 185763, at *11 ("[T]he Court is dubious that 9.84 seconds, about the time of an Olympic 100 meters

---

[1] Mr. Wiggington should not have been looking for and removing documents based on relevance. Plaintiff waived all objections to Defendant'd document requests by failing to raise them in a timely manner. (*See* Doc. 83-2.)

race, is a reasonable investment within which to identify a document, consider author and recipients, appreciate subject matter, assess for discovery responsiveness, assess for KRE 503 and federal work-product application, gauge for any exception, and finally make the decision to withhold or produce."). But Mr. Wiggington reviewed *more* than 51,732 pages in 36.6 hours, and he spent only *part* of those 36.6 hours actually reviewing documents.

Mr. Wiggington appears at times to place the blame on a tight schedule. *See* Wiggington Decl. ¶¶ 10, 13. But, if so, this was a time-crunch of Mr. Wiggington's own making, and it should not excuse his sloppiness. *See First Tech.*, 2013 U.S. Dist. LEXIS 185763, at *14-15 ("A party placing itself in a time vise does not get the same leeway as a pressured but blameless litigant."). Defendant served her document requests on Plaintiff's counsel on September 2, 2016, yet Plaintiff was still scrambling to produce documents in May 2017. And this self-created time pressure is not an excuse for failing to conduct a final review of documents before production. *See* Wiggington Decl., ¶ 12 ("[D]ue to a technical issue, I was unable to look at the disc in my office. I sent the disc anyway....").[2]

OnSomble appears to contend that the documents in question should be returned because they were (according to OnSomble) not responsive to Defendant's document

---

[2] There are inconsistencies in Mr. Wiggington's declaration that call into question the reliability of his testimony. First, he testifies that he mailed a disc containing Bates labeled version of the initial November 2016 paper production. That disc was never received. *See* Sanders Reply Decl. ¶ 3. Further, when those Bates-labeled scanned documents were produced, they were not identical to the initial November 2016 paper production. *See* Doc. 83 ¶¶ 8-9. They were in a different order, and they included documents not found in the November 2016 production and were missing documents found in the November 2016 production. Second, Mr. Wiggington testifies he wrote the May 30, 2017, letter. He did not. It was signed by John Tennyson. Third, he testifies that the May 30 letter described the three documents at issue. It did not. *See* Doc. 83-6.

3

Case 3:16-cv-00493   Document 95   Filed 07/20/17   Page 3 of 12 PageID #: 1169

requests. (*See* Opp. at 13.) The responsiveness or relevance of the documents at issue is beside the point. There is no basis for clawing back non-responsive or non-relevant documents. *See* Fed. R. Civ. P. 26(b)(5)(B); Fed. R. Evid. 502.

Therefore, because Plaintiff's counsel did not review Plaintiff's documents for privilege, and spent far too little time reviewing the documents, Plaintiff's efforts to prevent the production of the documents at issue were unreasonable, and any privilege in the documents has been waived.

**II.     By forwarding the documents at issue to Ms. Mathis-Stump, Mr. Mathis destroyed any privilege in them because Ms. Mathis-Stump was not a de facto OnSomble employee at the time, and forwarding them to her did not further the purpose of securing legal advice.**

In its Opposition, OnSomble admits that Ms. Mathis-Stump was neither an employee of OnSomble nor OnSomble's counsel when Mr. Mathis forwarded the documents at issue to her. Instead, OnSomble argues that, under something it calls the "*Kovel* Doctrine," Ms. Mathis-Stump's status as an outside independent contractor preserved the privilege. (Opp. at 6.)

This argument fails for two independently sufficient reasons. First, while a recipient's status as an outside independent contractor does not automatically destroy the privilege, the outside independent contractor's relationship to the client must be so close that she becomes a de facto employee. *See Exp.-Imp. Bank of the U.S. v. Asia Pulp & Paper Co., Ltd.*, 232 F.R.D. 103, 113 (S.D.N.Y. 2005) (explaining *U.S. v. Kovel*, 296 F. 2d 918 (2d Cir. 1961)). Here, OnSomble has failed to demonstrate that Ms. Mathis-Stump's relationship with itself "was so thoroughly integrated into [its] corporate structure that [s]he should be treated as though [s]he were a corporate employee for privilege purposes." *Exp.-Imp. Bank*, 232 F.R.D. at 113. Second, even if Ms. Mathis-

4

Stump were a de facto employee, she was still not an appropriate recipient of privileged information, under *Upjohn Co. v. United States*, 49 U.S. 383 (1981).

**A.     Ms. Mathis-Stump was not a de facto OnSomble employee.**

In *Kovel*, the Second Circuit held that the inclusion of the client's outside accountant in attorney-client communications did not destroy the privilege, but only because the accountant's presence was "necessary, or at least highly useful, for the effective consultation between the client and the lawyer." 296 F.2d at 922. The court elaborated: "What is vital to the privilege is that the communication be made in confidence for the purpose of obtaining legal advice from the lawyer." *Id*. "If what is sought is not legal advice by only accounting advice … or if the advice sought is the accountant's rather than the lawyer's, no privilege exists." *Id*.

In *In re Bieter*, the Eighth Circuit expanded *Kovel* in light of *Upjohn*. 16 F.3d 929, 936-37 (8th Cir. 1994). The court held that, under the right circumstances, *Upjohn* could be extended to outside consultants. *Id*. at 938. For example, an outside accountant might possess insider-level knowledge of the client's inner workings that, if the accountant were not permitted to speak frankly and confidentially with the client's counsel, the counsel's ability to represent the client would be compromised. *See id*. at 937 (following John E. Sexton, *A Post-*Upjohn *Consideration of the Corporate Attorney-Client Privilege*, 57 N.Y.U. L. Rev. 443, 498 (1982)).

Not all outside consultants will be so crucial to an attorney's ability to represent a client, however. The outside consultant must have "assum[ed] the functions and duties of a full-time employee," such that the outside consultant becomes a "de facto employee of the company." *Imp.-Exp. Bank*, 232 F.R.D. at 113 (following both *Kovel* and *Bieter*).

5

In determining whether an outside consultant meets this standard, courts look to: (1) whether the consultant had primary responsibility for a key corporate job; (2) whether there was a continuous and close working relationship between the consultant and the company's principals on matters *critical to the company's position in litigation*; and (3) whether the consultant is likely to possess information possessed by no one else at the company. *Id.*

The burden of proving the outside consultant meets this standard rests with the party asserting the privilege. *Id.* It is a high standard: "Before application of the attorney-client privilege will be extended to non-employees, however, the party asserting the privilege must make a detailed factual showing that the non-employee is the functional equivalent of an employee and that the information sought from the non-employee would be subject to the attorney-client privilege if he were an employee of the party." *Horton v. United States*, 204 F.R.D. 670, 672-73 (D. Colo. 2002).

At a minimum, the outside consultant must be extensively involved in the legal matter at issue. This is made clear in each of the decisions cited by OnSomble that found the continued existence of privilege. (Opp. at 6.) (In two of the decisions cited by OnSomble, *Noggle* and *Import-Export Bank*, the court found there was no privilege.)

- In *RoDa Drilling Co. v. Siegal*, 2009 U.S. Dist. LEXIS 4559 (N.D. Okla. Jan. 22, 2009), the consultant-accountant worked extensively with the plaintiff-client to negotiate and document the terms of the agreement that was at issue in the underlying lawsuit. *Id.* at *3-6. The court also held that the accountant's involvement in the attorney-client communications did not destroy the privilege because the deal in

6

question involved complex investments that the attorney needed to have explained. *See id.*

- In *American Manufacturers Mutual Insurance Co. v. Payton Lane Nursing Home, Inc.*, 2008 U.S. Dist. LEXIS 100080, at *7-9 (E.D.N.Y. Dec. 11, 2008), the outside consultant at issue was the plaintiff-client's construction consultant, placed in charge of overseeing the day-to-day operations of the plaintiff-client's construction project at issue in the underlying lawsuit. The plaintiff-client lacked the expertise to manage a construction project and granted the outside consultant with authority to make decisions on the plaintiff-client's behalf, including entering contracts. The construction consultant was also the plaintiff-client's "eyes and ears" in connection with the project and thus possessed information not possessed by anyone within the plaintiff-client's organization.

- In *CoorsTek, Inc. v. Reiber*, 2010 U.S. Dist. LEXIS 42594, at *16-17 (D. Colo. Apr. 5, 2010), the clients were inventors who lacked expertise in a field related to their invention. They hired an outside consultant in that field to assist them and their patent attorney in preparing the applications for the patents at issue in the underlying lawsuit.

- *Leone v. Owsley* stands for the unremarkable proposition that communications between counsel and non-testifying experts retained by the counsel are privileged. 2013 U.S. Dist. LEXIS 75432, at *10-11 (D. Colo. May 29, 2013), *rev'd on other grounds*, 810 F.3d 1149 (8th Cir. 2015). Contrary to OnSomble's description of this opinion, it does not cite *Kovel* or have anything to do with insurance brokers.

7

Case 3:16-cv-00493   Document 95   Filed 07/20/17   Page 7 of 12 PageID #: 1173

- *Hadjih v. Evenflo Co.* (sometimes known as *A.H. v. Evenflo Co.*) involved a public relations firm that worked extensively with Evenflo's counsel regarding the recall of the product at issue in the underlying lawsuit. 2012 U.S. Dist. LEXIS 76100, at *12 (D. Colo. May 31, 2012). Evenflo lacked a public relations department, and the public relations firm prepared a "communications plan regarding the recall" that had to be coordinated with the efforts of Evenflo's counsel. *See id.*

Here, there is no evidence, let alone a "detailed factual showing," that Ms. Mathis-Stump was actively involved in *any* legal matter. Based on the evidence provided by OnSomble, Ms. Mathis-Stump was nothing more than a passive recipient of the documents at issue. Nowhere in Ms. Mathis-Stump's declaration does she explain why these documents were forwarded to her, or what role she played in the underlying legal dispute (if one existed). She does not explain what information she alone possessed that would have been relevant to Mr. Abdou's assessment of the legal dispute. There is also no testimony from either Mr. Mathis about why he forwarded the documents to Ms. Mathis-Stump, or from Mr. Abdou about why he might have wanted Ms. Mathis-Stump involved.

Indeed, none of the tasks Ms. Mathis-Stump performed on OnSomble's behalf relates to the underlying dispute in the documents. By the date the documents were forwarded to her, Ms. Mathis Stump's consisted only of auditing investor files; writing blog posts; recording investor transactions; preparing and issuing stock certificates; drafting business plans; maintaining a "digital archive of company files"; leading undisclosed "research, writing and planning projects"; collaborating with Defendant on a book; and helping prepare a new joint Ethos-OnSomble product (but which was

8

quickly abandoned). Declaration of Rebekah Mathis-Stump (Doc. 85-1), ¶¶ 4-10, 13. None of these responsibilities implicates the debt OnSomble owed the Defendant, let alone any kind of specialized information that she possessed or required to carry out her duties.

Ms. Mathis-Stump is also silent about how much, and what proportion, of her time she spent working on OnSomble's behalf, where she worked, who supplied her office space and her equipment, and other indicia of a relationship with OnSomble that might have been the functional equivalent of a employer-employee relationship. *See* Restatement (Second) of Agency § 220(2) (1958). All she discusses is what her duties were, none of which was so overarching as to suggest the functional equivalent of an employer-employee relationship. In *Import-Export Bank*, a decision relied on by OnSomble, the court found the privilege in the attorney-client communication was destroyed by the inclusion of the outside consultant, even though he spent 85% of his time on the transaction in question, worked closely with the client's insiders on the transition and had been provided an office by the client. 232 F.R.D. at 113-14. Ms. Mathis-Stump does not even provide this much information in support of OnSomble's position.

For these reasons, Ms. Mathis-Stump was not a de facto employee of OnSomble. Therefore, by forwarding the documents at issue to Ms. Mathis-Stump, Mr. Stump destroyed any privilege in those documents.

**B.**   **Even if Ms. Mathis-Stump were a de facto employee of OnSomble, she was not an appropriate recipient of the documents at issue.**

OnSomble's analysis of Ms. Mathis-Stump's role stops at the issue of whether she was a de facto employee of OnSomble, appearing to believe that the privilege is

9

maintained no matter which OnSomble employee (or functional equivalent thereof) receives the attorney-client communications. If so, OnSomble is mistaken. As *Bieter* makes clear, a finding that an outside counsel is a de facto employe does not end the analysis, but is only the first part of a two-part question. 16 F.3d at 938. First, is Ms. Mathis-Stump's relationship to OnSomble of the sort that justifies application of the privilege? *See id*. The answer to that question is no, as argued above. Second, is Ms. Mathis-Stump an appropriate representative of OnSomble for purposes of an *Upjohn* analysis? *See id*. The answer to this question is also no, as argued below. Indeed, in *Bieter*, the court found that, although the outside consultant was a de facto employee of the client, he was not an appropriate participant in attorney-client communications under *Upjohn*, and the privilege was destroyed thereby. *Id*. at 938-39.

The participation of a client's employee in a communication with the attorney is privileged only if "(1) the communication was made for the purpose of securing legal advice; (2) the employee making the communication did so at the direction of his corporate superior; (3) the superior made the request so that the corporation could secure legal advice; (4) the subject matter of the communication is within the scope of the employee's corporate duties; and (5) the communication is not disseminated beyond those persons who, because of the corporate structure, need to know its contents." *Id*. at 936 (quoting *Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 609 (8th Cir. 1977), cited with approval by *Upjohn*, 449 U.S. at 391, 396)). The determination is made on a case-by-case basis. *See Upjohn,* 449 U.S. at 396-97.

Once again, there is no evidence that, by forwarding the documents to Ms. Mathis-Stump, Mr. Stump was attempting to secure or propagate any legal advice, that

10

the subject matter of the attorney-client communications was within Ms. Mathis-Stump's corporate duties, or that Ms. Mathis-Stump needed to know the contents of the documents based on OnSomble's corporate structure.

Therefore, because Ms. Mathis-Stump was not an appropriate recipient of the documents at issue under *Upjohn*, any privilege in those documents was destroyed the they were forwarded to her.

## III. Conclusion

For the foregoing reasons, and the reasons set forth in the Memorandum of Law in Support of Defendant's Motion for Determination of Privilege, the Court should find that Exhibits 1, 2 and 3 to Defendant's Motion for Determination of Privilege are not privileged, or that any privilege has been waived.

s/Richard G. Sanders/
Richard G. Sanders (Tenn. BPR No. 23875)
Paul R. McAdoo (Tenn. BPR No. 34066)
AARON & SANDERS, PLLC
810 Dominican Dr., Ste. 208
Nashville, TN 37228-1906
(615) 734-1188
Fax: (615) 250-9807
rick@aaronsanderslaw.com
paul@aaronsanderslaw.com

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing REPLY IN SUPPORT OF DEFENDANT'S MOTION FOR DETERMINATION OF PRIVILEGE is being filed and will be furnished via CM/ECF on this the 19th day of July, 2017, to:

John Tennyson
Tennyson & Wiggington
1801 West End Ave., Ste. 800
Nashville, TN 37203

Edward D. Lanquist, Jr.
Scott M. Douglass
Patterson Intellectual Property Law, P.C.
Roundabout Plaza, Ste. 500
1600 Division St.
Nashville, TN 37203

           s/Richard G. Sanders
           Attorney for Defendant